# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CARRIE L. SCOTT,**

                Plaintiff,

                                                              **Case No. 09-C-366**

    -vs-

**BECHTEL POWER CONSTRUCTION,**

                Defendant.

## DECISION AND ORDER

*Pro se* plaintiff Carrie Scott ("Scott") worked as a scaffolder on Bechtel Power Construction's ("Bechtel") Elm Road Generating Station Project (the "Project") from 2006 until she was laid-off in 2008. Scott alleges that her demotion and eventual termination was unlawful gender discrimination. Bechtel moves for summary judgment. For the reasons that follow, Bechtel's motion is granted.

## BACKGROUND

The Elm Road Generating Station Project, located in Oak Creek, Wisconsin, entails the construction of two coal-fired electric power plants at a projected cost of more than two billion dollars. Construction began in 2005. All of the construction or "craft workers" on the Project are represented by approximately 15 different labor unions. The craft workers are covered by the terms of a Project Labor Agreement negotiated with the Building and Construction Trades Unions, including the Chicago Regional Council of Carpenters.

Scott was first referred for work on the Project by the Carpenters Union hiring hall on December 11, 2006. The Carpenters are responsible for a variety of functions on the Project, including erecting and dismantling scaffolds. Plaintiff stopped working on the Project on August 1, 2007 because of a wrist injury. Bechtel granted a medical layoff.

Scott returned to work on February 26, 2008 and was rehired as a Foreman. David "Tex" Cummings, a Carpenter General Foreman, recommended that she be re-hired as a Foreman rather than a Journeyman and made that recommendation to Bechtel's Lead Civil Superintendent with responsibility for scaffolding, J.R. Steinem. Scott believed that Tex Cummings was "like a scaffold guru." According to Scott, she and Cummings knew more about scaffolding than any of the Lead Civil Superintendents that they worked for.

There were approximately 15-17 different scaffolding crews on the Project in the late Spring of 2008 and well over 100 Carpenters employed on those crews at that time. The Project's scaffolding operations were grouped into three different functional crews: (1) "piping crews," which supported work being performed by Pipefitters; (2) "boilermaker crews," which supported the Boilermakers; and (3) "balance of plant crews," which supported the work done by all the other trade unions working on the Project (e.g., Electricians, Painters). The overwhelming majority of the scaffolding crews on the Project were dedicated to Pipefitters and Boilermakers. After plaintiff's re-hire as a Foreman, there were only three balance of plant scaffolding crews on the entire Project. Plaintiff was the foreman on one of those three balance of plant crews.

Layoffs of craft workers on the Project are not based on seniority. Bechtel uses a craft-ranking process which rates the skills and abilities of craft workers and considers those ratings when selecting personnel for involuntary layoff. In the late Spring and early Summer of 2008, the Project employed more than 2,600 craft workers. That was the highest number employed at any one time.[1] In the summer of 2008, there were substantial layoffs. Eight carpenters were laid off in June; 48 were laid off in July; and 25 were laid off in August. Including Scott, only two of the 81 laid-off carpenters were women.

In addition to the significant layoffs of craft workers, there were managerial changes in the Project's scaffolding operations. In late April 2008, Greg Dixon replaced J.R. Steinem as the Lead Civil Superintendent with responsibility for scaffolding. General Foreman Tex Cummings and Dixon, however, disagreed on many different operational issues; thus, Dixon decided to replace Cummings as the General Foreman and assigned him to a different role. Upset with Dixon's decision, Cummings voluntarily resigned his employment in mid-June 2008. Richard Schlicke replaced Cummings as the General Foreman of the three balance of plant crews. Finally, in mid-July 2008, another Superintendent was assigned to assist Dixon.

As part of the July 2008 layoff, Dixon made the decision that only two balance of plant crews were needed on the Project going forward. Thus, Dixon decided to dismantle plaintiff's crew for several reasons. First, Dixon felt that Scott had been excessively absent from the Project, so he questioned her leadership ability and work ethic. Both of the other balance of plant crew Foremen had better attendance records. Second, Scott's crew spent the

---

[1] As of April 1, 2010, the Project employed approximately 750 craft workers.

-3-

majority of their time supporting Electricians and Painters. However, Dixon projected that there would be a dwindling need for Painter scaffolds on the Project which was not anticipated to increase. Third, Dixon believed that Scott's performance as a Foreman suffered from many of the same deficiencies he observed in Tex Cummings.[2] Plaintiff testified that she was loyal to Cummings and respected him, but didn't think much of Dixon. Finally, Dixon's personal observations confirmed the deficiencies noted by his predecessor, J.R. Steinem. Plaintiff often called Steinem or Dixon to report that she and her crew were stranded and unable to complete assigned scaffold work because her crew had no material to work with. This reflected Scott's inability to plan ahead or anticipate what needed to be done.

Dixon instructed Schlicke, the General Foreman, to notify plaintiff that her crew was going to be dismantled. Schlicke also informed Scott that she would no longer be a Foreman on the Project, but would assume a Journeyman role on one of the remaining two crews. Plaintiff responded that she wanted to speak with someone from Bechtel's Labor Relations Department. Scott spoke to Labor Relations Manager Greg Glynn and claimed that Schlicke was biased against women. Glynn asked Scott to prepare a handwritten complaint so he could conduct an investigation. Scott alleged that Schlicke told her that "he didn't feel that a woman had a place in construction." According to Scott, Schlicke made this comment in 2005 when they were working for a different employer, and then repeated the comment while they were working on the Project in 2007.

---

[2] For example, Cummings was known to keep unused scaffolds intact for future use, rather than promptly disassembling them as required.

-4-

Glynn investigated plaintiff's complaint and interviewed several witnesses, including Schlicke. Glynn learned that Schlicke and Scott had not worked on the same crew for at least eight months, and Glynn found no evidence suggesting that Schlicke had made the comment attributed to him. Glynn also reviewed Schlicke's July 2008 craft rankings for all of the balance of plant crews. Glynn believed that Schlicke's July 2008 rankings established the complete absence of any bias by Schlicke against plaintiff because only two of the more than 25 balance of plant Carpenters rated by Schlicke at that time received a higher score than Scott. Plaintiff was informed that Bechtel did not find any evidence that substantiated her claim against Schlicke.

In August 2008 – because additional Carpenter layoffs were necessary – Dixon reviewed the craft rankings that were completed a month earlier. Dixon disagreed with many of Schlicke's ratings, including the high scores that plaintiff received from Schlicke. Dixon decided to revise the rankings for seven Carpenters whom he believed had been grossly overrated by Schlicke, including Scott. All of the six other Carpenters were male. Dixon did not consult or confer with Schlicke prior to making the adjustments and Schlicke had no role on input in Dixon's revised rankings.

With respect to plaintiff, Dixon made downward revisions to her scores for "initiative, attendance, work production and quality." These revisions were due, in part, to Dixon's personal observations of Scott's deficiencies while working as a Foreman as well as her continued poor performance as a Journeyman (including excessive absenteeism). Dixon's August adjustments to Schlicke's July ratings resulted in four balance of plant Carpenters

-5-

who had been highly rated by Schlicke – including plaintiff – being selected for inclusion in the August 2008 layoff which affected 25 total Carpenters. Thus, Scott was laid off from the Project effective August 13, 2008.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Bechtel's motion complied with Civil L.R. 56(a)(1)(A) (Summary Judgment; Pro Se Litigation) by warning Scott that any factual assertions would be "accepted as being true unless the party unrepresented by counsel submits the party's own affidavit, declaration, or other admissible documentary evidence contradicting the factual assertion." Scott submitted three affidavits, a brief, and some other supporting materials, but for reasons that will become apparent, none of Scott's submissions contradict the relevant factual assertions in Bechtel's motion. Therefore, Bechtel's statements of material fact are admitted for purposes of this motion for summary judgment. Civil L.R. 56(b)(4).

The only direct evidence of discrimination offered by Scott is her claim that Schlicke made a sexist comment about women not belonging in construction. As an initial matter, Scott cannot rely upon the bare allegations in her complaint. In response to a motion for summary judgment, Scott was required to come forward with "specific facts showing a genuine issue for trial," supported by an affidavit or some other form of admissible evidence. Fed. R. Civ. P. 56(e)(2). "At summary judgment . . . saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact . . ." *United States v. 5443 Suffield Terrace, Skokie, Ill.*, — F.3d —, 2010 WL 2292185, at *5 (7th Cir.). Even if Scott did support this assertion with admissible evidence, it would not create a genuine issue of material fact because Schlicke was not the decisionmaker connected with Scott's demotion and eventual termination. "It is well established that 'statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself,' are insufficient to satisfy a plaintiff's burden of proof in an employment discrimination case." *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 n.4 (7th Cir. 1998). It was Dixon's decision to dismantle Scott's scaffolding crew, and then it was Dixon who selected Scott for layoff. Schlicke's craft rankings were actually generous in relation to Scott – too generous, according to Dixon.

Without any direct evidence of discrimination, Scott must proceed indirectly by establishing a *prima facie* case consisting of the following elements: (1) she is a member of a protected class, (2) she was qualified for the job in question or was meeting her employer's

-7-

legitimate performance expectations, (3) she suffered an adverse employment action, and (4) Bechtel treated similarly situated employees outside of Scott's class more favorably. *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1998); *Rudin v. Lincoln Land Comm. Coll.*, 420 F.3d 712, 724 (7th Cir. 2005).

Scott provides affidavits from former co-workers and supervisors who generally describe her as being good at her job. Assuming, without deciding, that this could create an issue of fact, Scott offers nothing to suggest that she was similarly situated to any male employees who were treated more favorably. For example, Scott complains that she should have kept her Foreman rate of pay after being demoted to Journeyman. In reality, Scott was one of 15 individuals in the Carpenter Foreman position who were demoted to Journeyman in 2008. The other 14 individuals were all male and they were all paid the lesser Journeyman rate after being demoted. D. 26, Glynn Affidavit, ¶ 10, Ex. 9.

Scott also complains that she should have been allowed to transfer from a balance of plant crew to a piping or boilermaker crew. There is no evidence that this alleged refusal was discriminatory because Scott doesn't provide evidence that similarly situated males were allowed to transfer. Furthermore, Scott fails to provide evidence that she was qualified to work as a scaffolder on a piping or boilermaker crew in the first instance. D. 27, Dixon Affidavit, ¶ 11.

Scott's final claim is that she was laid-off in retaliation for the complaint she filed against Schlicke. Dixon did not know about Scott's complaint when he included her in the August 2008 round of layoffs. D. 27, Dixon Aff., ¶ 10. Therefore, Scott cannot establish a

-8-

Case 2:09-cv-00366-RTR    Filed 06/23/10    Page 8 of 10    Document 34

causal connection between her complaint and her termination. *See Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (plaintiff must demonstrate a causal connection between her statutorily protected activity and an adverse employment action taken by the employer); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-69 (7th Cir. 2006) ("proof of retaliation under the indirect method presupposes that the decision-maker knew that the plaintiff engaged in a statutorily protected activity, because if an employer did not know the plaintiff made any complaints, it 'cannot be trying to penalize him for making them'").

Finally, in response to Bechtel's motion for summary judgment, Scott asked the Court not to dismiss her case because she is "in the process of getting a lawyer."[3] Liberally construed, this could be viewed as a motion under Fed. R. Civ. P. 56(f), which gives the Court discretion to deny a motion for summary judgment or order a continuance if a party "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition . . ." Scott failed to respond to discovery requests in a timely manner and never provided her initial disclosures. It is blatantly obvious that Scott did not diligently pursue her claims in this case. Scott is entitled to some leniency because of her *pro se* status, but she is not entitled to a continuance when her own lack of diligence is to blame for her inability to properly respond. *See Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002).

---

[3] Scott never moved for a court-appointed lawyer.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Bechtel's motion for summary judgment [D. 23] is **GRANTED**; and

2. This matter is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 23rd day of June, 2010.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA
U.S. District Judge**